[Civ. No. 4865. Third Appellate District.—March 19, 1934.]

D. H. SHEPHERD et al., Respondents, v. BOARD OF SUPERVISORS OF SAN JOAQUIN COUNTY, Appellant.

422

J. Leroy Johnson for Appellant.

Hubert H. Briggs and Stephen N. Blewett for Respondents.

THOMPSON, J.—This is an appeal in a proceeding in *certiorari*, from a decree of the Superior Court of San Joaquin County, canceling an order of the board of supervisors of that county which was previously made, authorizing the city of Stockton to annex certain uninhabited territory pursuant to the Statutes of 1899 and amendments thereto. (Stats. 1899, p. 37, and amendments thereto; 2 Deering's Gen. Laws of 1931, p. 2590, Act 5163.) The order of the board was annulled on the theory that it was made without the formality of a legal hearing, without competent evidence that the territory sought to be annexed was uninhabited, and because the owners of more than one-half of the privately owned property, as distinguished from that portion which was owned by the city, had formally protested against the action of the board.

Stockton is an incorporated city which is governed by a charter. (Stats. 1923, p. 1321.) The city sought to annex a strip of uninhabited territory extending from the western border thereof along the northerly bank of the Stockton channel, westerly a distance of a mile and three-fourths, to its confluence with Smith canal. One-third of this tract of land, nearest to the border of the city, is owned by private individuals and is included as a part of subdivisions 1 and 2 of "Stockton Acres", outside of the city limits, according to a recorded map of that district. The remaining two-thirds of the uninhabited tract, sought to be annexed, is owned by the city of Stockton.

A petition in due form, praying for annexation by the city of Stockton of this uninhabited strip of land, including both the privately and publicly owned contiguous portions thereof, was filed with the city council August 31, 1931. The petition was signed by the necessary number of citizens and contained all of the allegations required by law. After investigation, the city council, by resolution duly adopted, certified to the board of supervisors of San Joaquin County the fact that the petition had been filed and that it was in proper legal form, and thereupon requested the board to fix the time and place of hearing thereof as required by the act of the legislature. The board of supervisors promptly published notice of the hearing of the petition as required by law, setting the time for September 8, 1931. Pursuant to the statute, which provides that "any person owning any land so sought to be annexed, may object to said annexation by filing written remonstrance with said board of supervisors", nearly every owner of the privately possessed property sought to be annexed, filed written protests against the granting of the petition. No protest was filed in behalf of the city of Stockton, which owns two-thirds of the joint tracts sought to be annexed. Indeed, the city was anxious to annex the property for use for industrial purposes. It is conceded the proceedings are regular and valid to the time of the hearing of the petition for annexation.

The hearing before the board of supervisors, which acted in a *quasi*-judicial capacity in passing upon the sufficiency of the petition, was somewhat informal. However, representatives of both parties to the controversy were present with their attorneys at the time set for the hearing. Oral and

documentary evidence was adduced. The following stipulation regarding the taking of testimony at the hearing before the board was signed by respective counsel and filed in the *certiorari* proceeding, to wit: "It is stipulated by and between the parties hereto that the statements, attached hereto, are correct statements of the *oral testimony submitted* to the Board of Supervisors of the County of San Joaquin, State of California, on Tuesday, September 8, 1931, concerning the annexation of certain uninhabited territory, which is more particularly described in the petition in this action."

Regarding the issue as to the uninhabited character of the property in controversy, Walter B. Hogan testified, "It is uninhabited land and extends westerly from Buena Vista Avenue, along the north side of Stockton Channel, to Smith's Canal." J. Leroy Johnson testified regarding the same subject, "The land is largely owned by the city and it includes Louis Park. There is no one living on the land. It is uninhabited land with great industrial possibilities. The city is anxious to have it come in so that we may extend fire and police protection to it."

In behalf of the protestants, Dr. Margaret Smythe testified that she owned a house located upon the property in question "which was rented and occupied up to the time the City of Stockton was ready to pump in spoilage upon this area from its Deep Water Project". D. H. Shepherd testified "he considered his lot a part and parcel of inhabited territory". Stephen N. Blewett testified that the tract "although presently unoccupied was not in the general sense uninhabited territory". Clarence Keister testified that the Wagner Leather Company, of which he was a member, owned a warehouse which was located on the property, and that they were opposed to the annexation of the tract. He did not testify regarding the presence of inhabitants thereon. George F. Gilgert testified that "this subdivision was improved with dwellings, and families lived thereon". Other witnesses testified that the privately owned tract was subdivided into lots and blocks as shown by an official map thereof, that certain improvements existed thereon, and that individuals had lived on the property prior to the time when the city began pumping mud along the northern bank from the channel of Stockton canal. In respondents' brief all that they contend for regarding the actual residence of

people on the tract of land in question is expressed as follows: "Nobody has claimed that persons were actually dwelling upon this inundated private property. Consequently, there is no contradiction. But to say it was, at the time, uninhabited *from a legal aspect*, is quite a different proposition."

The evidence is quite convincing to the effect that no individual actually lived on any portion of the publicly or privately owned property sought to be annexed, at the time the petition was filed, or subsequently. It does appear that one or two families had lived upon a portion of the privately owned property some time prior to the date when the petition for annexation was filed. They moved away, however, when the city began to pump mud from Stockton channel upon the adjacent property. The clearing of this channel by the city was for public improvement. It has no bearing upon the merits of the present controversy. If the property owners were thereby damaged, they had their remedy in another action.

Upon that showing the Board of Supervisors formally determined by resolution duly adopted that the petition for annexation of uninhabited territory, was filed with the city council in the form required by law; that it was duly certified to the board of supervisors; that notice of the time and place of the hearing thereof was published according to law; that written protests against the proposed annexation were filed "by the owners of less than one-half of said new uninhabited territory"; that at the time and place fixed therefor the board "proceeded to hear all objections to said annexation and to consider the written protests concerning said annexation". The board, by resolution, thereupon adopted findings to the effect that "written protests to the annexation of said new uninhabited territory to the City of Stockton were filed by the owners of less than one-half of said uninhabited territory; that all said protests are hereby overruled and denied; that consent is hereby given to the City of Stockton, a municipal corporation, to the annexation of the said uninhabited territory, which is more particularly described as follows". (Here follows a particular description of the entire tract sought to be annexed.) Subsequently the annexation of this entire tract of uninhabited territory was approved by the city of Stockton at a special election which was called for that purpose.

Thereupon the respondents herein, each of whom is an owner of a portion of the privately possessed property included within the district sought to be annexed by the city of Stockton, filed this petition for a writ of *certiorari* in the Superior Court of San Joaquin County, asking for a decree canceling the order of the board of supervisors authorizing the annexation of the two adjacent tracts of land in controversy.

The petition for the writ of *certiorari* contains all of the proceedings which are necessary for a determination of the issues which are involved herein, and prays for a cancellation of the order of the board of supervisors which authorized the city of Stockton to annex the uninhabited contiguous tracts of land therein described. A demurrer to this petition was filed on the ground that it fails to state facts sufficient to constitute a cause of action authorizing the granting of the writ. Upon hearing of this petition for a writ of *certiorari* the Superior Court of the County of San Joaquin held that the board of supervisors was without jurisdiction to make the order overruling the protestations against the petition for annexation, or to authorize the annexation of the desired territory, for the reasons that the record shows the property to have been inhabited, and because it was assumed by the board that the owners of less than one-half of the territory sought to be annexed had filed protests against the petition, and that, upon the contrary, the board was not legally entitled to consider that major portion of the tract which belongs to the city, because its annexation was not first authorized by the voters of Stockton at an election called for that purpose. The trial court adopted findings in accordance therewith. A decree to that effect was thereupon rendered. From that decree the board has appealed.

The respondents contend that the proceedings before the board of supervisors are invalid for the reason that the witnesses were not sworn. In passing upon the sufficiency of a petition for annexation, the board sits in a *quasi*-judicial capacity. Its proceedings are necessarily somewhat informal. It is not expected the board will conduct its proceedings with all the precision of a court of law. It is necessary to a valid hearing that the respective parties shall have notice of the hearing and a fair opportunity to

attend and present the board with evidence affecting the issues which are involved. In the present case it appears that both parties were afforded that opportunity, and that the hearing upon the petition for annexation was sufficiently formal to render the decision of the board valid and binding.

■ Assuming that it is necessary for witnesses to have been formally sworn and that both parties should be given an opportunity to cross-examine witnesses, there is nothing in the record of this case to indicate that these formalities were not afforded. Both parties were represented by their attorneys. Testimony was adduced. It was stipulated that "oral testimony (was) submitted". Testimony is defined as "the statement made by a witness *under oath*". (3 Bouvier's Law Dict., p. 3264.) Under the stipulation which was made in this case we must assume the witnesses were duly sworn and that each party had the opportunity of cross-examination of witnesses.

■ The trial court was unauthorized in the *certiorari* proceeding to weigh the evidence adduced at the hearing of the board of supervisors, so as to upset its sole province and discretion of determining that the territory sought to be annexed is uninhabited. The evidence upon that subject is conflicting. The act specifically provides that "the decision of said board of supervisors upon said protestations shall be *final and conclusive*". Where a court or *quasi*-judicial tribunal has jurisdiction of a cause, the mere insufficiency of the evidence may not be considered in a proceedng on *certiorari*. (*White* v. *Superior Court,* 110 Cal. 60 [42 Pac. 480]; *Garvin* v. *Chambers,* 195 Cal. 212, 221 [232 Pac. 606]; *Brune* v. *Superior Court,* 113 Cal. App. 21 [297 Pac. 566]; *Winning* v. *Board of Dental Examiners,* 114 Cal. App. 658, 665 [300 Pac. 866]; *Sears* v. *Superior Court,* 133 Cal. App. 704 [24 Pac. (2d) 842]; 4 Cal. Jur. 1036, sec. 14.) In the White case, *supra,* it is said:

"Nothing is better understood than that on this proceeding the single question involved is whether the lower court has exceeded its jurisdiction. If it has not, no matter how grievously it may have erred to the prejudice of the petitioner, either in matters of fact or matters of law, this writ will not afford an avenue of relief."

In the Garvin case, *supra,* it is said: "It is a fair summary of the decisions of this state, dealing with the scope of

statutory *certiorari*, to say that the evidence adduced upon the hearing before an inferior board or tribunal having limited jurisdiction may be brought up to the reviewing court upon *certiorari* for the sole purpose of determining whether or not, from the evidence before it, *the finding of a jurisdictional fact by such inferior board or tribunal is sustainable*, and *if there be no evidence* to sustain such decision it must be annulled."

Granting that *certiorari* will lie when there is no evidence in the record upon which a board of supervisors could base its decision that the land sought to be annexed to a city under the provisions of the Statutes of 1899 (Stats. 1899, p. 37, and amendments thereto) is uninhabited, it may not be said there is no evidence upon that subject in the present case. Two witnesses testified before the board that the land in question "is uninhabited". This is sufficient to show there is evidence in the record upon which the board was authorized to determine whether it was inhabited or uninhabited. The fact that other witnesses testified to the contrary raises only a conflict. ▮ The introduction of the map which shows that the privately owned portion of the tract has been platted is not necessarily in conflict with the oral testimony that it was uninhabited. Many an ambitious realtor has platted a vacant tract of land adjacent to a thriving city and lingered a long time in hope of persuading someone to inhabit the property. Nor is the presence of dwelling-houses or other buildings on the premises or occupants thereof at some previous time conclusive of the question as to whether it is presently inhabited. If that were the test, the famous old mining town of Shasta City, with its historic deserted buildings, would be evidence that that romantic ghost city of the golden days of '49 is still inhabited. Clearly the term "uninhabited", as it is used in the annexation statute which is here involved, means that the property is not presently occupied by persons who actually live or abide thereon. (Webster's New Int. Dict. of 1928, p. 1109; 8 Century Dict. & Cyc., p. 6618.)

▮ The respondent, however, insists that the board of supervisors was bound to deny the petition for annexation, since the evidence is uncontradicted that the owners of more than one-half of the privately possessed land filed written protests against the annexation, and that the portion of the

tract which is owned by the city of Stockton could not be legally taken into consideration, since it constitutes seventy per cent of the entire tract sought to be annexed, and, if considered, it would render the protests of the owners of privately possessed property useless, and because the city council had no legal authority to either consent to or protest against the annexation without a previous vote of the electors of Stockton with relation thereto.

The statute provides that: "At the time specified in said notice, or at such other time as may be fixed by postponement, the said board of supervisors shall hear said protestations, and unless the remonstrances are filed by the owners of more than one-half of the land sought to be annexed, the decision of said board of supervisors upon said protestations shall be final and conclusive. In the event that the owners of more than one-half of the land so sought to be annexed, file remonstrances against such annexation, said protestations shall be sustained by said board of supervisors, and shall be a bar to any further proceedings under the provisions of this act for the period of one year."

It thus appears that when a board of supervisors determines that protests against annexation have been filed by the owners of more than "one-half of the land sought to be annexed", the only legal authority which it possesses is to "sustain the protests" and deny the petition for annexation. In other words, it is asserted that when it appears to the board, without conflict, that protests against annexation have been filed by the owners of more than one-half of the land sought to be annexed, the board is without jurisdiction to do more than sustain the protests and deny the petition.

This appears to be the clear meaning of the statute. It therefore becomes necessary to determine whether the board had a right to take into consideration that portion of the entire tract sought to be annexed, which is owned by the city of Stockton.

We are of the opinion the city of Stockton has a right under the statute to annex property owned by the city without the necessity of first procuring authorization therefor from the electors of the city. The statute does not require an election to be first held for that purpose. It does require the annexation to be approved at a subsequent election to be held for that purpose after the petition has been

first approved by the board of supervisors. That election was held and the annexation was approved.

The city council, under the authority of the charter, acting as the agents of the city, has the authority to conduct the preliminary proceedings incident to the annexation of uninhabited territory pursuant to the provisions of the statute above cited. The charter of Stockton constitutes the city council its agent or governing body, subject only to the limitations expressly stated therein. Article IV, section 1, of the charter (Stats. 1923, p. 1336) provides in that regard: "There is hereby created a City Council which shall be the governing body of the municipality. It shall exercise the corporate powers of the city and, subject to the expressed limitations of this charter, shall be vested with all powers of legislation in municipal affairs adequate to a complete system of local government consistent with the constitution of the state."

As such agents of the city, the council has the exclusive control of the use and management of city property, subject only to specified limitations. Article V of the charter provides in part:

"As the legislative body of the city, the council may, subject to the provisions and restrictions of this charter, have power:

.   .   .   .   .   .   .   .   .   .   .   .   .

"(46) To improve . . . streets, avenues, sidewalks, lanes, alleys, courts, places or public ways or property. . . .

"(64) To enact appropriate legislation *and to do and perform* any and all other acts and things which may be necessary and proper to carry out the general powers of the city or any of the provisions of this charter; and to adopt and enforce all such measures and to establish all such regulations in case no expressed provision is in this charter made as the city council may deem expedient and necessary for the promotion and protection of the health, comfort, safety, life, *welfare, and property* of the inhabitants of the city."

We are of the opinion the board of supervisors properly considered the entire tract of land sought to be· annexed, including both the privately controlled and city owned property in determining whether the owners of more than one-half of the entire tract of land sought to be annexed had protested against the proposed annexation. Under the cir-

cumstances of this case, it is undoubtedly true that, since the city owns two-thirds of the entire tract, a protest of the owners of the entire privately owned portion thereof would be insufficient to defeat the petition. This may be unfortunate for the private owners, but the statute makes no distinction between public or private owners of land. It is argued that this results in an injustice to the private owners. But if their contention be correct, and only the privately owned property could be considered, under such circumstances it would work just as grave an injustice against the city, for that would bar the possibility of a city annexing its own property when protesting owners of private property intervene between the publicly owned territory and the city. Under such circumstances it would be impossible for a city to annex its own land, necessary and valuable as such annexation might become. With full appreciation of the hardship which annexation may impose upon the intervening private owners of the property which is here involved, we are convinced that a reasonable construction of the statute impels the conclusion that both the publicly and privately owned uninhabited territory sought to be annexed to the city in one contiguous tract must be considered by the board of supervisors in determining whether the petition should be approved.

There is no evidence in the present case to indicate that the petitioners for annexation exercised fraud in describing the lines which bound the territory sought to be annexed. It is charged that the city deliberately gerrymandered the district so as to exclude therefrom properties which are inhabited by individuals. There is nothing in the statute prohibiting that action. But the lines describing the property sought to be annexed appear to follow natural limitations, such as streets, blocks and a railroad right of way. So long as the boundaries of the tract sought to be annexed are adopted without fraud or in violation of the statute, we are of the opinion they are controlling upon the board in determining the merits of the petition.

The judgment canceling the order of the board of supervisors is therefore reversed.

Pullen, P. J., and Plummer, J., concurred.

A petition by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 17, 1934.